Appellant, Tonya Tolson, appeals the decision of the Warren County Court of Common Pleas, Juvenile Division, to terminate her parental rights and grant permanent custody of her daughter, Christina Brock, to Warren County Children Services ("WCCS").[1] We affirm.
From approximately February 1995 until March 1996, WCCS caseworker Joseph Atkinson attempted to avoid removing Christina from appellant's home. The main concerns were domestic violence between appellant and her live-in boyfriend, Philip Dunn, and physical abuse of the children[2] by Dunn. For example, Dunn threatened to kill appellant while holding a knife to her neck. This incident occurred in front of the children. Also, WCCS believed Christina was injured on her shoulder after being struck by Dunn.
On February 9, 1996, WCCS filed a complaint with the Warren County Court of Common Pleas, Juvenile Division, alleging that Christina was dependent. On April 29, 1996, the magistrate found that Christina was a dependent child. On June 17, 1996, all the parties consented to WCCS taking temporary custody of Christina.
According to Atkinson, the initial case plan called for appellant "to stay away from [Dunn], and that's what was implemented, and that's what the agency tried to encourage the mother to do." However, appellant continued the relationship with Dunn. Based on the reality that the relationship between Dunn and appellant was going to continue, an amended case plan called for reunification of Christina with appellant and Dunn. The plan stated that "[i]nclusion of [Dunn] is recommended due to [appellant's] insistence on a relationship with him and his significant involvement with Christina prior to placement." Atkinson explained that by amending the plan, the agency was "trying to work where the mother is."
The plan noted the following problems/needs: (1) appellant was not consistent in utilizing WCCS services; (2) appellant had exposed her children to Dunn, who had been abusive to her and her children; and (3) appellant failed to provide for Christina's basic needs.
The plan called for appellant and Dunn to receive comprehensive psychological examinations and parenting assessments, drug and alcohol assessments, and parenting classes. In addition, appellant was required to attend a group addressing domestic violence issues and the Warren County Mother's Group. Finally, appellant was required to obtain adequate housing, maintain employment, and pay child support.
On May 13, 1997, due to appellant's alleged failure to successfully complete the case plan, WCCS moved for permanent custody of Christina because she could not be placed with appellant within a reasonable time. The September 26, 1997 report of the guardian ad litem recommended that the motion be granted. A hearing on the motion occurred July 28, 1997 and September 19, 1997. On October 28, 1997, the magistrate recommended the motion be granted. On November 6, 1997, appellant filed objections to the magistrate's decision and requested an additional hearing. An additional hearing was held February 6, 1998 in which appellant, in an offer of proof, sought to introduce additional evidence. The trial court adopted the magistrate's decision of October 28, 1997 in a February 17, 1998 entry. On March 12, 1998, after considering appellant's offer of proof, the court, in an amended decision and entry nunc pro tunc, re-adopted the magistrate's decision. Appellant filed a timely notice of appeal and raises three assignments of error for our review:
Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN REFUSING TO ALLOW APPELLANT TO PRESENT ADDITIONAL EVIDENCE AT THE HEARING ON THE OBJECTIONS TO THE MAGISTRATE'S DECISION.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY THE ADMISSION OF HEARSAY EVIDENCE.
Assignment of Error No. 3:
 THE DECISION OF THE TRIAL COURT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
For simplicity of discussion, we first address appellant's third assignment of error. In the third assignment of error, appellant argues that the decision of the trial court is against the manifest weight of the evidence. On appeal, a grant of permanent custody cannot be reversed for being against the manifest weight of the evidence where it is "supported by competent, credible evidence going to all the essential elements of the case." In re Turner (June 23, 1997), Butler App. Nos. CA96-09-191 and CA96-09-192, unreported, at 4, citing In re Lay (1987), 43 Ohio App.3d 78, 80.
In considering appellant's manifest weight of the evidence claim, we note that natural parents have a constitutionally protected liberty interest in the care and custody of their children. See Santosky v. Kramer (1982), 455 U.S. 745,102 S.Ct. 1388. A motion by the state to terminate parental rights "seeks not merely to infringe that fundamental liberty interest, but to end it." Id. at 759, 102 S.Ct. at 1397. In order to meet the constitutional demands of due process, the state is required to demonstrate by clear and convincing evidence that the statutory standards have been met. Id. at 769, 102 S.Ct. at 1403. "Clear and convincing evidence" requires that the proof "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of syllabus.
When a state agency moves for permanent custody, the trial court is required to hold a hearing to determine "if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion." R.C. 2151.414(A)(1). In order to grant permanent custody to a state agency, the agency must demonstrate that it is in the best interest of the child and that any of the following apply:
 (1) The child is not abandoned or orphaned and the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents;
 (2) The child is abandoned and the parents cannot be located;
 (3) The child is orphaned and there are no relatives of the child who are able to take permanent custody.
R.C. 2151.414(B).
At a permanent custody hearing, the trial court shall consider all factors relevant to the child's best interest. R.C. 2151.414-(D). The factors include, but are not limited to:
 (1) The interaction and interrelationship of the child with his parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressly directed by the child or through the guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child;
 (4) The child's need for a legally secure permanent placement and whether the type of placement can be achieved without a grant of permanent custody to the agency.
Id.
When granting permanent custody to a public children services agency, the trial court also must find that one of the factors enumerated in R.C. 2151.414(E) exist. In re William S. (1996),75 Ohio St.3d 95, syllabus.[3] The factors include:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. * * *
* * *
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
* * *
(12) Any other factor the court considers relevant.
R.C. 2151.414(E). If one of the factors apply, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." Id.
 Appellant's Reunification Effort
In this case, Atkinson generally testified about appellant's consistent lack of progress toward reunification. One notable observation was that appellant "many times" relied on her mother, Rosalynn Wilson, to care for the children. For example, Atkinson remembered he and appellant reviewing Christina's health history when Wilson was present. Wilson had to remind appellant of Christina's hospitalization for respiratory infection. Also, appellant and Dunn lived with Wilson for an extended period of time. Despite the fact that Wilson's income was only $400 a month, appellant and Dunn did not contribute to household bills.
Cheryl Leeds, a "legal advocate" with the Warren County Family Abuse Center, facilitated a group, Women Who Resort To Violence. After appellant completed the twelve week program (June to October 1996), Leeds concluded that appellant had made progress, but remained a risk for future domestic violence and required additional individual counseling.
Andrea Louise Carter, a WCCS employee, coordinates the Warren County Mother's Group, an abuse and prevention group. According to Carter, between approximately September 1996 and June 1997, appellant was invited to eighteen meetings, but only attended four. Overall, Carter characterized appellant's participation as below average. In addition, appellant and Dunn failed to attend parenting classes recommended by WCCS.
Russell Dern, a psychologist and Clinical Director of the Community Health Center of Warren County, also testified for WCCS. Dern was given a referral from Atkinson to conduct psychological evaluations of appellant and Dunn. Under Dern's direct supervision, Lisa Lyle, a post-doctorate fellow, conducted psychological tests on appellant and Dunn. The tests revealed appellant had "borderline range of intellectual functioning and mild mental retardation." Dern elaborated that appellant would have difficulty with abstract concepts or situations and had a "vulnerability to being overwhelmed by life stresses."
Appellant did not testify at the permanent custody hearing, but offered a handwritten statement which conceded that she lacked adequate housing, employment, or financial means to raise Christina. In addition, the parties stipulated that appellant failed to pay child support or even inform WCCS that she was working.
 Appellant's Relationship with Dunn
After Christina was put in temporary custody of WCCS, appellant's destructive relationship with Dunn continued. Brian D. Wallace, a police officer with the South Lebanon Police Department, testified that on October 3, 1996 he filed a report in which appellant stated that Dunn raped her. Joseph B. Mullins Sr., another officer in the South Lebanon Police Department, testified that a domestic violence scenario occurred in November 1996 in which Dunn threatened to commit suicide with a knife.
The evidence also showed Dunn failed to effectively participate in the case plan. Dunn never completed necessary therapy for his abusive tendencies or his dependency on drugs and alcohol. The evidence established that Christina strongly resented Dunn and told Amy Lynn Siegel-Brown, a therapist with Comprehensive Counseling Service, during therapy that she wanted to hurt or kill Dunn. The record shows that Dunn was also physically and sexually abusive toward appellant. Appellant's refusal or inability to permanently separate from Dunn was a significant factor for the magistrate to consider. See R.C. 2151.414(E)(12).
 Evaluations of Christina
Siegel-Brown testified about therapy provided to Christina from approximately September 1996 to May 1997. Siegel-Brown stated that the original diagnosis of Christina was "physical abuse of a child. She was having a lot of behavior problems. She was very bossy, she was angry, very quickly angered." Siegel-Brown testified that "[Christina] told me she was going to kill [Dunn] so that he could not kill her. She had a plan. She knew what she wanted to do, and she * * * in a very detailed manner, described it to me." Also, Christina informed appellant that if she returned to appellant and Dunn "it would be okay because Tonya [appellant] would protect her" by "us[ing] a knife on Dunn." Based on Christina's anger and history of being abused, Siegel-Brown could not recommend reunification, although if Dunn "underwent considerable changes" she felt he could have "positive interactions" with Christina.
After months of therapy with Christina, appellant felt her ability to channel anger had improved considerably. Due to the need for permanency, Siegel-Brown recommended Christina stay in foster care until a permanent home was found. Siegel-Brown felt that if appellant remained with Dunn and he had not undergone necessary therapy for his pattern of abusive behavior, reunification with Christina was "very dangerous."
Eckart Wallisch, a psychology assistant at the Children's Diagnostic Center, testified that Atkinson gave him a referral to evaluate Christina. According to Wallisch, the evaluation was a team approach which included an educational specialist, a social worker, and a psychologist, Dr. George Pallotta. As part of his preparation of the final report, Wallisch observed a visitation which included Christina, appellant, Dunn, and Wilson on November 22, 1996. Wallisch observed that Wilson tended to assert the more active role during the visitation.
Wallisch also conducted a series of psychological tests to evaluate Christina. The tests included a children's adaption test in which children look at "pictures of animals, families, other individual animals and [the children] interpret their interactions." In all of the scenes, Christina interjected a violent theme, which Wallisch interpreted as a sign of Christina's insecurity and a "feeling like the world around [her] is pretty dangerous."
Finally, Shirley Cole, adoption coordinator for WCCS, testified that, despite Christina's behavioral problems, she was "very adoptable" at age five. Cole emphasized the need for Christina to have permanency in her life. See R.C. 2151.414(D)(3) and (4).
Based on the totality of the evidence presented, we conclude that clear and convincing evidence existed that Christina could not be returned to appellant within a reasonable time. The decision to terminate appellant's parental rights and grant WCCS permanent custody of Christina was in the child's best interest. Accordingly, the third assignment of error is overruled.
In the first assignment of error, appellant argues that the trial court erred by failing to consider additional evidence that appellant sought to admit after the permanent custody hearing. Due to a delay in preparing the transcript, approximately four months passed between the magistrate's recommendation and the final ruling of the trial court. Appellant claims that the trial court should have allowed her to admit additional evidence that she was not living with Dunn anymore and her general living conditions had changed.
Juv.R. 40(E)(4)(b), consideration of objections, provides that:
 Except as provided herein, upon consideration of any objections, the court may adopt, reject, or modify the magistrate's decision, hear additional evidence, recommit the matter to the magistrate with instructions, or hear the matter itself. * * * The court may refuse to consider additional evidence proferred [sic] upon objections unless the objecting party demonstrates that with reasonable diligence the party could not have produced that evidence for the magistrate's consideration.
Juv.R. 40(E)(4)(b), which was largely rewritten and became effective July 1, 1995, has apparently not been directly analyzed in the case law. However, it is clear the rule provides for the introduction of additional evidence at the discretion of the trial court. Absent an abuse of that discretion, the decision of the magistrate must be affirmed on appeal. See In re Zindle (1995), 107 Ohio App.3d 342, 345-46 (applying former Juv.R. 40, the court concluded the decision to hear additional evidence after a referee's report had been filed was discretionary).
In this case, the trial court's decision to deny appellant's request to present new evidence was well within its discretion. The fact that appellant may have recently separated from Dunn and improved her living conditions does not automatically justify the introduction of additional evidence. As we have detailed, the decision of the trial court to terminate appellant's parental rights was based on a long-term pattern of behavior documented at the permanent custody hearing. Cf. In re Lintner Bell (July 27, 1998), Butler App. No. CA97-10-187, unreported, at 9-12. Moreover, we note that Atkinson testified that appellant had separated and returned to Dunn on "a number of occasions." The trial court was entitled to conclude this pattern could continue. Accordingly, the first assignment of error is overruled.
In the second assignment of error, appellant argues that she was prejudiced by the trial court's reliance on inadmissible hearsay at the permanent custody hearing. It is settled that the rules of evidence apply at the adjudicatory hearing which seeks to permanently terminate parental rights. In re Baby Girl Baxter (1985), 17 Ohio St.3d 229, 233; In re Sims (1983), 13 Ohio App.3d 37,40-41. The trial court is presumed to disregard hearsay and the burden is on appellant to overcome this presumption by showing that the trial court relied on hearsay in its decision. In re Colter (Apr. 16, 1990), Madison App. No. CA89-07-011, unreported, at 7.
Appellant argues that throughout the presentation of the case by WCCS, inadmissible hearsay was introduced which unfairly prejudiced appellant. Particularly, appellant points to the fact that Atkinson referred to various reports he did not personally prepare. For example, appellant points to Atkinson's testimony on the evaluation of Christina by therapist Siegel-Brown. However, Siegel-Brown personally testified as to her counseling of Christina. Siegel-Brown noted the psychological problems of Christina from past physical abuse, including Christina's wish to kill Dunn. Therefore, even assuming Atkinson's testimony was inadmissible hearsay, we perceive no unfair prejudice. Colter at 7.
Similarly, Dern, Lyle's supervisor at the Community Health Center, testified about his expert opinion regarding the evaluations conducted by Lyle. Therefore, any comments Atkinson made regarding the report are merely cumulative. Id. In regard to the reports of the Children's Diagnostic Center, Wallisch personally testified to preparing and/or reviewing the entire report, which he kept in his personal file.
Finally, to the extent Atkinson, an employee of WCCS, discussed reports prepared by WCCS, the reports are covered under the public records hearsay exception. In the Matter of Ritter (Sept. 30, 1996), Trumbull App. No. 95-T-5316, unreported, at 2. See Evid.R. 803(8). To the extent Atkinson discussed reports from other agencies to show that he relied on them to prepare appellant's case plan, his testimony is not hearsay because the reports are used to show the effect on the mind of the hearer. Id.
In summary, even assuming Atkinson improperly testified as to the contents of reports from other agencies, we fail to see any unfair prejudice. The trial court specifically referred to the testimony of the eight other witnesses for WCCS, who generally testified from first-hand knowledge. In addition, appellant conceded that she lacked a "stable home," money, or employment to care for Christina and failed to maintain proper child support. Based upon the overall record, we presume the trial court disregarded any inadmissible hearsay. Colter at 7. Thus, the second assignment of error is overruled.
Judgment affirmed.
POWELL, P.J., and WALSH, J., concur.
[1] Christina's natural father, Tom Haas, never participated in the case plan or the permanent custody hearing and is not a party to this appeal.
[2] Christina has a half-sister, Felicia, whose custody is not at issue in this appeal.
[3] When William S. was decided, R.C. 2151.414(E) included eight specific factors. R.C. 2151.414(E) was subsequently revised to include twelve factors. Factor twelve is "[any] other factor the court considers relevant." R.C. 2151.414(E)(12). Consequently, the importance of the holding in William S. has been greatly diminished.